[Cite as *In re R.M.*, 2017-Ohio-4325.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: R.M.

:
:
:     C.A. CASE NO. 27318
:
:     T.C. NO. 2013-6460
:
:     (Civil Appeal from Common
:      Pleas Court, Juvenile Division)
:
:

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____16th____ day of _____June_____, 2017.

. . . . . . . . . . .

MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Appellee

JOYCE M. DEITERING, Atty. Reg. No. 0005776, 8801 N. Main Street, Suite 200, Dayton, Ohio 45415
      Attorney for Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the October 28, 2016 Notice of Appeal of I.M. ("Father"). Father appeals from the October 21, 2016 "Decision and Judgment Concerning the Objections to the Decision of the Magistrate," which overruled his

objections to the Magistrate's Decision and granted permanent custody of Father's son, R.M., who was born in 2013, to Montgomery County Department of Job and Family Services – Children Services Division ("MCCS"). We hereby affirm the judgment of the trial court.

{¶ 2} MCCS filed a "Dependency Complaint" and a "Motion and Affidavit for Interim Temporary Custody at an ex parte Proceeding" in the juvenile court on September 16, 2013, alleging that R.M. was born by C-section at 32 weeks gestation, due to his mother, R.B. ("Mother") having severe pre-eclampsia. According to the complaint, R.M. weighed 3 pounds, 5.8 ounces at birth, and he was put on a ventilator with brain and kidney problems. The complaint alleged that Mother did not realize she was pregnant until she was six months into the pregnancy and did not receive prenatal care. The complaint further provides that Father has been abusive to Mother, and that there are concerns "both parents have alcohol abuse issues." The complaint provides that Mother has two older children who live with a relative in Kentucky due to Mother's alcohol abuse. According to the complaint, the family is from Nepal, without family resources, and they do not speak English. The complaint further provides that Mother was discharged from the hospital, and that R.M. remains in the NICU. According to the complaint, a caseworker, with an interpreter, visited Mother and Father in their home, and they had no baby supplies, furniture or a bed for themselves or any source of income, and they reportedly were living on unknown savings. The complaint provides that Mother and Father struggle with connecting with resources due to their language barrier and lack of support.

{¶ 3} According to the complaint, R.M. had two bilateral brain hemorrhages and

was on oxygen for a time, and he had a feeding tube while hospitalized. The complaint provides that Mother and Father have visited R.M. in the hospital "sporadically," with several days between visits. It further provides that the hospital is preparing to discharge R.M. The complaint provides that the agency has concerns about the parents' ability to meet R.M.'s special needs, and it notes that at a meeting with hospital staff on September 12, 2013, both parents threatened to harm or kill themselves if they are not permitted to take R.M. home with them. Finally, the complaint provides that Mother may be married to a man who remains in Nepal, and that Father is also married to someone else who lives in Nepal. The court issued an "Order of Temporary Custody ex Parte" on the same date the complaint was filed.

{¶ 4} After a shelter care hearing on September 20, 2013, a "Magistrate's Order of Interim Custody" was issued 10 days later. It provides that Mother and Father have substance abuse issues and do not have appropriate supplies in their home for R.M. It provides that MCCS has concerns that R.M.'s medical issues may be the result of Mother's consumption of alcohol during her pregnancy. The order provides that interim temporary custody to MCCS is in R.M.'s best interest.

{¶ 5} A hearing on the complaint was scheduled for November 15, 2013, and on that date, the "Report of the Guardian Ad Litem" ("G.A.L.") was filed. It provides that the G.A.L. recommends that the juvenile court grant temporary custody to MCCS. On December 5, 2013, the "Magistrate's Decision and Judge's Order of Disposition of Temporary Custody" was filed. The Magistrate determined the allegations in the complaint to be true and declared R.M. a dependent child.

{¶ 6} On August 3, 2014, MCCS filed a "Motion and Affidavit for a First Extension

of Temporary Custody to MCCS." The affidavit of Shelly Aggarwal provides that Mother and Father are making progress on their case plan objectives, and that they are both employed at a restaurant full time, each making $800.00 per month. According to the affidavit, both parents completed the Council for Alcohol and Drug Abuse Services therapy for substance abuse, both parents deny current use of alcohol, and both completed parenting classes. Aggarwal averred that Mother and Father were living rent free in an apartment provided by their employer, and they still need to obtain independent housing. The affidavit provides that MCCS was providing assistance in locating housing and utilities. According to Aggarwal, both parents visit with R.M. at MCCS on Wednesdays from 1:00 - 4:00 p.m., unless they are unable to leave work. Aggarwal averred that Mother and Father make every effort to attend the visits, and that they are "very loving and nurturing" to R.M., bringing age appropriate snacks and toys to share with him. The affidavit provides that both parents are attentive to R.M. and spend most of the visits playing and talking with him.

{¶ 7} On October 22, 2014, the "Magistrate's Decision and Judge's Order Granting a First Extension of Temporary Custody" was filed. It provides that Mother and Father made progress on their case plan objectives "but they still need to obtain and maintain independent, safe and appropriate hous[ing] that is not provide[d] by their employer." The Magistrate found that a first extension of temporary custody to MCCS is in R.M.'s best interest.

{¶ 8} On January 30, 2015, and February 3, 2015, MCCS sought a second extension of temporary custody. The supporting affidavit of Shelly Aggarwal provides that in December 2014, "the parents called MCCS and stated that they had moved to

Virginia to live with a relative and look for work. The parents did state that they intended to return to the Dayton area in two months. MCCS has attempted to make contact with the family via phone however the phone number was disconnected." The affidavit provides that the family "still needs to obtain independent housing and a source of income." On February 13, 2015, Aggarwal filed Affidavits for Service by Posting, averring that Mother's and Father's whereabouts were unknown.

{¶ 9} On April 15, 2015 a "Magistrate's Decision and Judge's Order Granting a Second Extension of Temporary Custody" was filed. It provides that Mother and Father have left the State of Ohio, their whereabouts are unknown, and that based on the credible testimony presented in court, a second extension of temporary custody is in R.M.'s best interest.

{¶ 10} A "Motion and Affidavit for Commitment to the Permanent Custody of MCCS" was filed on July 22, 2015. Aggarwal's affidavit provides at the end of December 2014, "the parents stopped coming to visitation when they moved out of state." Aggarwal averred that Mother and Father are "reporting that they have obtained housing and benefits through Human Services in Rochester[,] New York. In addition [Father] has obtained part-time employment. Since December 2014, MCCS made several attempts to get in touch with the parents. MCCS did not have a working phone number for the parents." According to the affidavit, when "MCCS did speak to the parents in January 2015, the parents were asked to make monthly contact with MCCS but the parents did not. In July 2015, MCCS was again able to make contact with the parents by phone. With the assistance of an interpreter, MCCS did arrange a meeting with the parents that would take place on the phone." Aggarwal averred that when "the phone conversation

took place the parents did tell MCCS that they had housing, benefits, income, and were not * * * drinking alcohol. The [p]arents did e-mail MCCS proof of housing, income, and benefits." According to Aggarwal, in July 2015, MCCS "made the request that New York complete an interstate home study to determine if the parents' home was appropriate for the child. The child continues to do well in care. The child attends speech therapy weekly at Dayton Children's and receives HMG/PACE service bi-weekly to help with his socialization. The child is not school age." The affidavit provides that no "relatives are able, willing and appropriate to care for the child." The affidavit further provides, "[b]ecause the parents are unfit/unable to care for the child, it is in the best interest of the child for the Court to commit the child to the permanent custody of MCCS."

**{¶ 11}** On September 22, 2015, a "Motion to Transfer Foster Care" was filed by counsel for Father. It provides in part that Father "hereby moves this Court for an Order transferring the child's foster care provider to someone residing in or near Rochester, New York, because both parents do not have the financial resources to travel to Dayton, Ohio for visits with the child and cannot obtain employment in or near Dayton, Ohio." The motion provides that "[b]oth parents now reside by economic necessity in New York where they have suitable housing and employment." An "**Amended** Motion and Affidavit for Commitment to the Permanent Custody of MCCS" was filed on September 24, 2015. A "Notice of Hearing" for November 9, 2015 was issued on September 29, 2015.

**{¶ 12}** At the start of the hearing on November 9, 2015, counsel for Father indicated that his "Motion to Transfer Foster Care" was pending, and that he sent a copy of the motion and the notice of hearing to Father via ordinary mail, and that the mail was not returned as undeliverable. He stated, "My client has not appeared this morning, at

least as of now 10:00 a.m. an hour past the Notice date and time. The question initially is whether it's ethical for me to proceed on the Motion at all by perhaps calling the caseworker on cross or whether it is inappropriate for me to do anything." The Magistrate responded, "I guess, I would want to hear some testimony from the caseworker."

{¶ 13} Counsel for Father called Aggarwal as if on cross examination. She stated that she has been involved with R.M. and his parents since September of 2013. When asked how compliant the parents were with their visitation schedule with R.M., Aggarwal stated that ,"[i]n general, they would come to visitation. However, they would leave their work to come to visits. And they worked at an Indian restaurant at the time. So, if their employer said, hey, we're going to be really busy today or there's going to be a large party [sic]. Then they would not come to the visitation." She stated that "there were times where there would be weeks would pass and they wouldn't come to visitation. But they would tell us because it was their employer would not allow them to leave work [sic]. But when there was not an issue with work according to the parents, then they would come to visitation."

{¶ 14} Aggarwal stated that "around December 2014 they had been coming regularly, weekly" to visit R.M., and then they stopped coming, and she stated that "we assumed that it was because they were busy at work." She stated that "several maybe a couple maybe two to four weeks had passed and they hadn't come," and the Father then "called me and said that he was in Georgia[1]. They had gone to Georgia and that they would be back in two months to get [R.M.]." She stated that she received the call

---

[1] We note that in MCCS' motions seeking a second extension of custody, Aggarwal averred that Father advised her that the family had moved to Virginia.

from Father in January 2015, and "then when I attempted to call him in February that number was no longer valid and I didn't have a way of contacting them."

{¶ 15} When asked if she subsequently learned that Mother and Father had relocated to Rochester, New York, Aggarwal responded as follows:

A. Prior to them moving to Rochester I had received a call from, she said she was a family friend and then she said she was an aunt. So she identified herself as an aunt. But said she was a family friend [sic]. She said the family was living in New Jersey. So, she had given me her contact information to make contact with the family. So, when I had called back because I had to get an interpreter to do the conversation, I was unable to actually reach the parents. So, the next month approximately, I would say around April of 2015 I received an email from a gentleman named Bhawani Bhujel from Rochester Rehabilitation. And he said that he was their case manager and he was working with them to obtain benefits and services in the community.

{¶ 16} Aggarwal stated that she asked Bhujel for a Release of Information from both parents, and that he "said okay." She stated that she did not hear from him again in April or May. Aggarwal testified that "that was around the time that the Agency needed to do their filing. So, I made a last attempt to make another contact with him * * * around June of 2015" to obtain the Releases of Information. She stated that she received the Releases near the end of June 2015, and she "set up a phone conference with an interpreter along with the parents for the first week of July of 2015." On that phone conference, Aggarwal stated that Mother and Father told her they were living in

Rochester, that Mother was pregnant and due in July or August 2015, that Father was working part-time, and that they "had received benefits in regards to housing. They were receiving housing through Rochester. Food stamps and some cash assistance." Aggarwal stated that she confirmed this with documentation from their case manager who "emailed me those documents."

{¶ 17} Aggarwal testified that during the phone call she reminded Mother and Father that they had not seen R.M. "since December and that it was important for them to see their child. I told them we would be willing to work around their schedule. If they needed assistance with bus [sic], the Agency would assist with that. We also talked about even phone calls or Face Time, and they said they would do it." According to Aggarwal, "they said they needed time to get it set up, needed time to get it arranged. And I did not hear anything after that in regards to visits." Aggarwal stated that when she spoke to Father in July, he told her that he could not come visit because of Mother's pregnancy and approaching due date. She stated that every month she contacted Bhujel, "but I didn't hear anything back from him either until I saw the parents at the last court date." (The record reflects that Mother and Father attended an Annual Review/Permanency Planning hearing held on August 17, 2015).

{¶ 18} The following exchange occurred:

Q. Do you recall having a telephone discussion with me about the possibility of transferring foster care to a family living in or near Rochester, New York, where these financially limited parents reside?

A. Yes.

Q. And is it the policy of your employer that we don't transfer foster

care to another city and state that you'll need to file a motion to pursue that issue? [sic]

A. After speaking to my supervisor and manager I was instructed that it would be [in] the best interest of the child to keep him in the foster home that he's been in for the past two years and receiving services. So, at that time I was instructed by the Agency would not be in agreement to transferring the child to New York. [sic]

* * *

Q. Is there a network or system that enables your employer to communicate with its counterparts and other cities and states to identify * * * the availability of foster families in those other locations to substitute for a local foster family?

A. We have the ability to contact other county children services and make contact with them, yes.

Q. In this case it was a policy decision that we're not going to do that, correct?

A. Correct.

Q. Would you agree these parents in this case have limited financial resources to travel?

A. When I saw them last, he was working. He had an income. They * * * were receiving over $600.00 in food stamps. Their housing was being paid for it was approximately [$]575.[00]. So, he did have in my opinion, he had the income to come to see the child. He had told me he

was off on the weekends from work. So that time I had explained to him that the Agency can assist him in bus fare to come and see the child.

Q. When the parents lived here, they did reasonably exercise their visits, correct?

A. Yes.

Q. These parents are from what country?

A. They're originally from Bhutan.

* * *

Q. Was it your understanding that the parents moved to New York out of economic necessity?

A. Yes, that's what they reported.

Q. Do you have any reason to dispute the truth of those representations?

A. No.

Q. Were you able to confirm that they do have suitable housing and employment in New York?

A. Yes.

Q. Foster care providers do exist in Rochester, New York, is that a fair statement.

A. To the best of my knowledge, yes.

Q. And if the child were to be placed with a foster care provider in Rochester, New York, it would be financially, practically easier for these parents to visit with child, is that a fair statement?

A. - - Umm - - it would be more convenient for the parents because the child would be closer. However, the Agency has been willing to pay for their bus fare to come to visit the child.

{¶ 19} In the course of direct examination by counsel for MCCS, Aggarwal stated that she explained to Mother and Father at the August court hearing that they needed to visit R.M., and that she was willing to organize in person visits as well as over the phone visitation. She stated that it was the parent's responsibility to contact her to arrange visitation. Aggarwal stated that R.M.'s current placement is appropriate for him and that all of his needs are being met there. She stated that he is bonded to the foster parents "very much," and that it is in R.M.'s best interest for him to remain there, since he has been there since birth, and it is "really the only family that he's known. They provide his basic needs. And his special needs especially his speech delays and speech therapy as well as his Help Me Grow Program."

{¶ 20} The G.A.L. provided the following recommendation to the Magistrate:

* * * With respect to the Motion that is pending before the Court, as we have heard recently from Ms. Aggarwal and as I've indicated in the report that I've filed [sic]. [R.M.] has had the benefit of a continuity of care provided by foster care providers here since * * * almost since birth, I think he was placed with Mr. and Mrs. [C.] a month after his birth. But because of that continuity of care, his needs have been met, he is doing well in their care and he has come to rely upon care being provided to him by Mr. and Mrs. [C.]. It would be this guardian's recommendation that the Motion be denied on the bases of that, your Honor.

**{¶ 21}** The Magistrate then overruled Father's "Motion to Transfer Foster Care," noting that "[t]his decision is being made in the best interest of the child, as the child has had his primary needs met in the last few years by this current foster placement and he needs continuity of care."

**{¶ 22}** After a recess, counsel for Father indicated that he has had no contact with Father since the last hearing in August, although Father did call "one afternoon while I was out of the office about a month ago." Counsel for Father indicated that he returned the call the next day and left a voice message "and there's just been nothing since."

**{¶ 23}** Aggarwal then resumed the stand and in response to questions by counsel for MCCS, she identified R.M.'s birth certificate and "the paternity establishment" for Father. She stated that R.M. went from the hospital into foster care due to concerns about domestic violence between the parents, concerns about Mother's drinking, and concerns about "the family having the proper items they needed for the baby." Regarding Father's case plan, Aggarwal testified that she explained the objectives to him in the presence of an interpreter. Aggarwal stated that Father's case plan objectives were to "obtain and maintain housing, verifiable income, complete parenting class, * * * follow all recommendations, complete a Crisis Care Assessment and follow recommendations. And provide financial and emotional support to [R.M.] and visitation for [R.M.]." She stated that she met with Father monthly through December 2014.

**{¶ 24}** Aggarwal stated that she provided housing referrals to Father. She stated that she received verification that Father was employed at the end of June 2015, and that when she spoke to him in August he confirmed that he was employed. Aggarwal stated that she saw paystubs through August. When Father was in Montgomery County,

Aggarwal stated that he was employed at an Indian restaurant and that she "had made a referral for a family support worker to assist him and locate employment through the Job Center to apply for benefits, for cash assistance, food stamps, medical assistance." She stated that Father followed through with the referrals, that he competed parenting classes, namely Celebrating Families, "around February, March of 2014." Aggarwal stated that she referred Father to Crisis Care Assessment in September, October of 2013, based on a concern that Father was drinking too much, and that he completed the program. She stated that the "hospital also had a concern that dad may have been coming to the hospital after he had been drinking."

{¶ 25} When asked about Father's visitation case plan objective, Aggarwal testified that at the court hearing in August 2015, she "attempted to set up a visitation for the family whether it was before court or after court and court was I believe at 1:30 that day. * * * And they said they could come to the Agency at 12:00. They would visit him from 12 to 1:00 before court. They arrived at the Agency at 12:50 so they saw the child for about 10 to 15 minutes before court that day." She stated that "[s]ince then, they haven't seen him." Aggarwal stated that prior to that, there had been an eight-month lapse in visitation.

{¶ 26} Aggarwal stated that when she first received the case, Mother and Father were visiting with R.M. twice a week, and "the visits were going great. We never had concerns, they were very appropriate. They were very affectionate towards him. They would bring toys and food for him." She stated that as the parents' work schedules changed, "our visits had gone from two days to one day because that worked better for them with their employment." She stated that the parents visited "from 12 to 3 [or] 12 to 4

because that worked better for their schedule." Aggarwal stated that the parents did not take advantage of her offer for bus tickets when they were in New York. When asked if the parents explained why they had not visited in such a long time, Aggarwal replied that "they said they had just moved to New York and they were getting established. They were working. They were just busy getting benefits and * * * establishing themselves in New York. And plus the mother * * * was pregnant so, she didn't want to travel too much." Aggarwal testified that she "explained to the parents to let me know when they would want to do the phone conversations that way," and that either through her or MCCS "we would have an interpreter to guide that, facilitate that via the phone. But I was never told a time or date that they would like to do that." Aggarwal stated that Mother and Father told her that "they had friends * * * there that had cell phones and that they would be able to do the Facebook, Face Time." She stated that they never had contact with the child through either medium.

{¶ 27} Aggarwal stated that R.M. has been in the same foster home for over two years, and that he is "doing great. He is very bonded with both foster parents. They also have two other foster children in the home. So, he's very bonded to the boy and girl in the home. He's very playful. He's just doing great." Aggarwal stated that R.M. has special needs, and that he is in speech therapy once a week and is involved "with Help Me Grow Pace biweekly." When asked to describe R.M.'s relationship with his foster parents, Aggarwal stated that when R.M. "falls or he needs something, he goes to them. He's very playful with them. He hugs them. They're very loving towards him. They've never even used respite since they've had him. They take him on trips where they go, on vacations, on church retreats, he's always with them." Aggarwal stated that R.M.'s

foster parents love him and would like to adopt him. She stated that Mother and Father did not provide the names of any family members willing to adopt R.M.

{¶ 28} Finally, the following exchange occurred:

Q. In summation why is reunification with the mother and the father no longer possible in his case?

A. Because they have not had contact, really had any contact with [R.M.] for almost a year now. When he did see them for about ten, fifteen minutes in August, he was so upset. He just kept on crying and screaming and trying to run out of the room. And since I've been working with the child, I've never seen those behaviors. He was running to me, he was running to the interpreter. So, he just wasn't comfortable with the family. Even when the family came to see him for the ten minutes they didn't, they weren't very affectionate towards him * * * at all. And so, it was kind of an awkward meeting when they saw him. So, he doesn't really have a bond with them. He doesn't know them at all. He's been in his current home for two years. They're able to provide his basic needs. They take care of his special needs. And he's happy and well taken care of here.

Q. So, it's fair to say with the extended gaps in visitation * * * that this child does not have a family relation with neither the mother nor the father?

A. Correct.

Q. And why does the Agency believe it's in the best interest to grant permanent custody at this time?

A.   So, the child can have stability.   He can have permanency.   He can continue getting his services.   Continue to remain in the same home.   And just give him that ability knowing that is where he's going to remain.

Q. If permanent custody was granted today what would be the plan for this child?

A.   The plan would be to transfer this case to adoptions and start the adoption process with the current foster family.

{¶ 29} In response to questions from counsel for Father, Aggarwal stated that Father completed his housing objective, his employment objective, his parenting class objective, his assessment objective at Crisis Care, and that while he was engaged in visitation before he and Mother relocated in December of 2014, he did not complete the visitation objective.   Aggarwal acknowledged that Mother and Father did not have a vehicle, and she stated that she did not send them money for transportation or purchase a bus ticket for them "because they never made contact with me to tell me when they would be coming or when they would like to come."   She stated that Monroe County Children Services in New York conducted a home study and approved the parents' residence.   She stated that during the time when Father visited R.M. in Dayton, the visits went well and he was bonded to the child.   She stated that she advised Father that MCCS would pay for his bus ticket, and that he told her that he did not work on the weekends. She stated, "when he told me that he was off on the weekends, I said, well, why don't you start coming on the weekends * * * for the visits, we'll set up the transportation and he said * * * that he would get back to me over the visitation."   Aggarwal stated that "the bus comes here from Rochester and there would be enough

time for him to visit his son and he could return back to Rochester for work on Monday."

{¶ 30} In response to questions from counsel for MCCS, Aggarwal stated that Mother and Father did not provide for R.M.'s emotional needs for the past year. She stated that the parents had her contact information as well as that of their interpreter, and that they knew how to reach her and the interpreter. At the conclusion of the hearing, the G.A.L. recommended that MCCS be granted permanent custody of R.M.

{¶ 31} On January 26, 2016, a "Magistrate's Decision and Judge's Order Granting the Motion for Permanent Custody" was issued. It provides that MCCS provided case management services, substitute foster care, and information referral services, and "the parents have failed to respond to the above services because they are unable to demonstrate parenting skills and they left the State of Ohio in December 2014." The Magistrate noted that no relatives are willing and able to care for R.M., and that he has been in foster care 12 or more months out of the last 22 months. The Magistrate noted that Father has "visited the child one time since December 2014." The Magistrate found that Father's "case plan objectives and progress on those objectives are as follows: (1) Legal father was to obtain appropriate housing and income prior to leaving the State of Ohio in December 2014. This objective is not complete. (2) Legal father was to complete parenting classes. The legal father completed parenting classes through Celebrating Families. This objective is complete. (3) Legal father was to complete a Drug and Alcohol Assessment and was referred to CADAS and he completed substance abuse treatment. This objective is complete." The Magistrate noted that the "mother and father have abandoned the child," and that there "is a reasonable expectation of adoption." According to the Magistrate, "mother and father have not demonstrated the

ability to parent the child or to provide for the basic needs of the child."

{¶ 32} The Magistrate further found that the "mother and father have failed to utilize psychiatric, psychological and other social and rehabilitative services and material resources that were made available to them for the purpose of changing parental conduct to allow them to resume or maintain parental duties." The Magistrate found that "[t]he mother and father were referred to English Second Language Classes which would assist them in obtaining stable income and housing; however, the mother and father failed to follow through with that referral and instead left the State of Ohio." The Magistrate noted that the parents' "departure from the State of Ohio prevented them from providing an adequate, permanent home for the child in Montgomery County," and that they "have demonstrated a lack of commitment toward the child by failing to support, visit, or communicate with the child when able to do so or by other actions showing an unwillingness to parent the child."

{¶ 33} The Magistrate found that R.M. is "thriving in his current foster placement," and that the foster parents want to adopt him. The Magistrate further found that "the child is not sufficiently mature to assist counsel in this case." The Magistrate determined that the "custodial history in this case dictates permanent custody being granted as the child has been in foster care since he was born."

{¶ 34} Father filed objections on February 5, 2016, along with a request to supplement them upon receipt of the transcript. On June 24, 2016 a "Memorandum in Support of Objections" was filed. It provides that the "parents had been regularly visiting with the child, but visitation stopped when the parents moved out of state at the end of December, 2014. Other than the cessation of visits, both parents had substantially

complied with their respective case plans." The memorandum provides that "the parents were brought from the country of Bhutan to the United States as refugees on behalf of an agency." It provides that they "had difficulty adapting to a community where no one spoke their language and there was no opportunity to be with other members of their culture" in Dayton. Counsel for Father asserted that the parents moved to New York for "better job opportunities and the ability to interact with other members of their culture," and that for financial reasons, "it became challenging for the parents to maintain visits here" with R.M. The memorandum provides that "[b]y economic necessity, the parents were residing in New York where they had suitable housing and employment." It further provides that "[b]ased on agency policy, Children's Services refused to consider transferring foster care to Rochester, New York in an effort to reunify the child with the parents." Counsel for Father asserted that "[t]his is a most unfortunate policy when the Agency concedes that it has the ability to communicate with other county children's services agencies in other states and make arrangements."

**{¶ 35}** Counsel for Father asserted as follows:

So, in this case, Montgomery County Children's Services confirmed that the parents of the child had suitable housing and employment in New York, acknowledged that there are counterpart agencies available for them to communicate with, that foster care providers do exist in Rochester, New York, and that transferring the child to a foster care provider in New York would be financially and practically easier for these parents to visit and reunify with their child. In this case, The Agency refused to consider this option, simply stating that it could provide bus fare and if the parents don't

come visit here, then we're not willing to do anything else.    That is troubling.

**{¶ 36}** Counsel for Father noted that the Magistrate orally denied Father's motion to transfer foster care at the November 9, 2015 hearing.    Counsel for Father asserted as follows:

The caseworker testified that father had a housing objective which was completed.   He had an employment objective which was completed. He had a parenting class objective which was completed.   He had an assessment objective which was completed.   Prior to the family relocating in December, 2014, father was engaged in visits.   And he was engaged with the PACE or Help me Grow program.   Thus, until the time of the move, the father had met or was in compliance with all of his case plan objectives.

* * *

After the family moved to Rochester, New York, the Agency offered bus fare, but never sent the parents money and never actually purchased any tickets for transportation.

Montgomery County Children's Services contacted Monroe County Children's Services in the State of New York.   The residence of the parents was approved.   Employment was confirmed.

These parents, who suffered persecution, were brought to the United States from the Kingdom of Bhutan, a country located in the Himalayan Mountains in Asia which has long maintained a policy of strict isolationism, both culturally and economically.   Only in the last few decades have foreigners even been allowed to visit this country.   Obviously, our culture

and our government procedures and policies were alien to these parents. The unwillingness of [MCCS] to facilitate the child being transferred to foster care near where these parents had some opportunity to flourish in our country is unreasonably sad and wrong.

   * * *

When this case began, the child was placed in foster care, presumably pursuant to Chapter 5103 of the Ohio Revised Code which begins with numerous sections relating to foster care givers. Interestingly, that same chapter includes the Interstate Compact on the Placement of Children, § 5103.02 et seq. of the Ohio Revised Code. It is respectfully submitted that a blanket "policy" on not considering a transfer of a child in foster care to another state where the parents reside and work violates the spirit if not the verbiage of the Interstate Compact on the Placement of Children.

**{¶ 37}** Counsel for Father directed the juvenile court's attention to *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096 and asserted that MCCS "has apparently not changed its policies and is still failing to make reasonable efforts to reunite families when parents relocate to other states. The facts in this case are more compelling than in Seacrest and should require a remand to the Agency to make full use of the Interstate Compact before seeking permanent custody."

**{¶ 38}** "MCCS' Reply to Supplemental Objections" was filed on July 8, 2016. MCCS asserted that R.M. has been in Agency custody for more than 12 of 22 months, and "the issue is no longer whether or not reunification with the parent will take place

within a reasonable time." MCCS asserted that R.M. is abandoned, and that permanent custody in his best interest.

{¶ 39} In overruling Father's objections, the juvenile court noted that "MCCS believes that reunification is not possible because the parents have had no contact with the child for quite some time. When the child did see the parents in August he was very upset and kept trying to run out of the room." It was significant to the court that R.M. "does not know the parents and does not have a bond with them." The court noted that "MCCS recognized that the parents' inability to speak, read, or write English created a language barrier between the parents and MCCS," and that MCCS referred them to English language classes, but that "neither Mother nor Father ever took advantage of those classes." Regarding Father's motion to transfer foster care, the court noted that "MCCS acknowledges that there are foster homes in New York, and if the child lived closer to the parents it would be easier for the parents to visit with the child, however, MCCS was willing to provide the parents with transportation to visit with the child and parents effectively refused."

{¶ 40} The court determined as follows:

Taking into consideration parents' lack of economic resources and communication skills, as well as their physical location, MCCS offered both parents numerous options to connect with the child. Options offered to Mother and Father included transportation for personal visits with the child at MCCS' expense to video phone calls that would have required minimal effort from the parents. The parents chose to move to Georgia, then New Jersey, and then New York, while leaving their child behind and failing to

make any effort to maintain contact with their child. Because of the extreme length of separation brought about by the parents' actions, the child sadly no longer even recognizes his parents.

Given the circumstances, this Court finds that it is not in the child's best interest to remove him from the only family and home he has ever known to live with a new foster family in New York or his long absent parents.

**{¶ 41}** The court found that R.M. "has been in Agency custody for over twelve months of a consecutive twenty-two month period," and that it is in his best interest for MCCS to receive permanent custody.

**{¶ 42}** Father asserts one assignment of error herein as follows:

WHETHER THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE GRANTING PERMANENT CUSTODY TO MCCS WHEN THE AGENCY FAILED TO MAKE A REASONABLE ATTEMPT TO REUNIFY THE FAMILY BY REFUSING TO TRANSFER THE CASE PURSUANT TO THE INTERSTATE COMPACT.

**{¶ 43}** Father directs our attention to *Secrest* and asserts that "MCCS ignored the fact that Appellant had difficulty traveling to Ohio to be with his child, that attainment of the goals of the case plan may be enhanced by a transfer, and that a transfer may be a viable option in this case. Accordingly, as in Secrest, the record in this matter does not support a finding that MCCS made the required reasonable attempt to reunify the family."

**{¶ 44}** As this Court recently noted:

"R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency." (Citation omitted.) *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013–Ohio– 2935, ¶ 14. Specifically, the court must find by clear and convincing evidence that: "(1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *Id.,* citing *In re K.M.,* 8th Dist. Cuyahoga No. 98545, 2012–Ohio–6010, ¶ 8, and R.C. 2151.414(B)(1).

*In re J.P.,* 2d Dist. Montgomery No. 27093, 2016-Ohio-5351, ¶ 36.

**{¶ 45}** Father's arguments are addressed to MCCS' efforts toward reunification and the agency's failure to transfer foster care to New York. As this Court noted in *In re A.D.,* 2d Dist. Miami No. 2007 CA 23, 2008-Ohio-2070, ¶ 7:

"R.C. 2151.412 requires the agency to prepare and maintain a case plan for children in temporary custody with the goal '[t]o eliminate *with all due speed* the need for the out-of-home placement so that the child can safely return home.' ["] (Emphasis added.) *In re C.F.,* 113 Ohio St.3d 79, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 29, quoting R.C. 2151.412.

However, R.C. 2151.419, which requires the trial court to determine whether the agency made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home," does not apply to a hearing on a motion for permanent custody filed under R.C. 2151.413. *In re C.F.* at ¶ 43. Moreover, "the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody." *Id.* at ¶ 42, 862 N.E.2d 816. Nevertheless, the agency must establish that it made such efforts prior to the termination of parental rights.

**{¶ 46}** In *Secrest*, upon which Father relies, this Court determined that MCCS failed to make reasonable efforts to reunify mother and her daughter, reversed the permanent custody award to MCCS, and remanded the matter for further proceedings. MCCS became involved with mother in June of 1999, and in February of 2000, the agency sought temporary custody of her three children.[2] *Id.*, ¶ 3, 8. This Court noted the following facts:

In September, 2000 [mother] moved to Pennsylvania and married. She contacted a social worker in her county regarding transferring the children to Pennsylvania. MCCS was informed by a Pennsylvania social worker that [mother's] home was "nice" and "clean." The record further show[ed] that [mother's] husband is employed, and that [mother] is

---

[2] The appeal in *Secrest* pertained solely to one of mother's daughters.

financially able to stay at home, where she cares for a child born of her new marriage, and for her grandchildren.

MCCS refused to transfer the case, instead requesting [mother] to return to Ohio and complete her case plan. MCCS caseworker Tracie Hughes indicated that the case was not transferred because [mother] did not complete her case plan. Specifically, Hughes complained that [mother] failed to attend most of the children's various appointments and visitations and failed to obtain a parenting and psychological assessment. However, Hughes admits that MCCS did not make a referral for the assessment until February, 2001. Additionally, Hughes was unable to produce documentation indicating that [mother] was timely informed of the children's appointments. The record also indicates that [mother] was unable to travel to Ohio for some of the appointments and visits due to her pregnancy. Hughes also noted that MCCS recognized that the children in their temporary custody were bonded to [mother].

*Id.*, ¶ 6-7.

{¶ 47} On November 29, 2000, MCCS sought permanent custody, and after hearings were held in April and October, the magistrate awarded permanent custody of two of the children to MCCS, and the third was placed in a permanent planned living arrangement. *Id.*, ¶ 8. [Mother's] objections to the magistrate's decision were overruled. *Id.*

{¶ 48} With regard to the reunification requirement, this Court noted as follows:

* * * "Reasonable efforts are described as being a good faith effort

which is 'an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.' ["]   *In re Cranford* (July 24, 1998), Montgomery App. Nos. 17085 and 17105, citing *In re Weaver* (1992), 79 Ohio App.3d 59, 606 N.E.2d 1000.   "The issue is not whether CSB could have done more, but whether it did enough to satisfy the 'reasonableness' standard under the statute." [Citation omitted].

*Id.*, ¶ 13.

{¶ 49} This Court, in reversing the matter for further proceedings, provided the following rationale:

* * * In this case, it is undisputed that upon moving to Pennsylvania, [mother] did not attend the majority of the children's appointments, and did not have any regular visitation or telephone contact with them. However, it is also clear that [mother] made an effort to have the children, and the case, transferred to Pennsylvania. She even went so far as to put MCCS in contact with a social worker from her county of residence regarding the transfer. Additionally, while it is not clear from the record how far away [mother] lived in Pennsylvania, her counsel asserted at oral argument that she live[d] far enough away from Dayton to make it difficult to drive here on a regular basis, and the agency's counsel did not contradict this assertion.

From our review of the record, we conclude that, despite [mother's] request, MCCS made a decision not to transfer the case, because [mother] had not completed the case plan set by MCCS. Specifically, Hughes stated that the case was not transferred "because [mother] had not attended

medical, school and counseling appointments other than two or three * * * [a]nd, we had not seen a consistency that would show us that she would continue to do these things if the children were relocated."

The record does not demonstrate that Pennsylvania would not accept a transfer of the case. Furthermore, it appears that a transfer would be possible under the Interstate Compact on the Placement of Children. See, R.C. 2151.39 and R.C. 5103.20. We conclude from our review of the record that MCCS did not seriously consider the possibility of transferring the case, and did not pursue that option. Instead, it appears that MCCS determined that because [mother] had failed to travel to Ohio to comply with the case plan, it would not attempt to seek any alternative avenues aimed at reunification. In adopting that approach, MCCS ignored the fact that [mother] had difficulty traveling to Ohio to be with her children, that attainment of the goals of the case plan may be enhanced by a transfer, and that a transfer may be a viable option in this case.

*Id.*, ¶ 17-19.

**{¶ 50}** We conclude that *Secrest* is distinguishable from the matter herein. We initially note that the social worker in *Secrest* indicated that mother's children were bonded to her while in temporary custody, whereas herein, Aggarwal testified, and the juvenile court found, that R.M. does not know his parents at all and does not have a bond with them. While Father asserts that MCCS refused to transfer foster care simply based on agency "policy," Aggarwal testified that her supervisor instructed her "that it would be in the best interest of the child to keep him in the foster home that he's been in for the past

two years and receiving services."

{¶ 51} As noted above, R.M. went into foster care in late September 2013, and unlike the *Secrest* mother, who apparently sought the transfer of foster care at the time of her move to Pennsylvania, Father's motion to transfer was filed on September 22, 2015, after the parents had been out of state for nine months, and after the agency sought permanent custody after two extensions of temporary custody.

{¶ 52} Aggarwal testified that in January 2015, the parents advised her that they had moved out of state. According to Aggarwal, she asked the parents at that time to make monthly contact, but the agency subsequently lost contact with the parents when their phone was disconnected. At that time, the parents' whereabouts were unknown. Aggarwal testified that she then was provided with contact information for the parents from an "aunt," or family friend, who reported the parents were in New Jersey. When Aggarwal attempted to reach the parents with an interpreter, however, she was unable to do so. In April of 2015, Aggarwal testified that she received an email from Bhujel, and that she requested he obtain a release of information from the parents. She stated that she did not hear from Bhujel again in April or May. MCCS did not have contact with the parents again until July 2015, at which time Aggarwal again advised Father of the imperative need to visit with R.M. She offered bus fare, and suggested phone calls and Face Time as appropriate means to make contact. According to Aggarwal, while the parents indicated that they had access to cell phones and would follow up, they failed to do so. Aggarwal stated that she contacted Bhujel each month without hearing back from him. Aggarwal next saw the parents at the August 17, 2015 hearing, at which time she again advised them of the importance of visiting R.M., and again offered to organize in-

person visits as well as telephone visitation. She testified that she believed at that time Father "had the income to come to see the child," as well as time on the weekends to do so. Aggarwal testified that the parents arrived late to the August 2015 hearing and were only able to visit with R.M. for 10 or 15 minutes. She testified that the parents were not affectionate towards R.M., and that at that time he was crying, screaming, and trying to run out of the room, behaviors she had not previously observed in R.M. Aggarwal testified that after the eight-month lapse in visitation, R.M. did not know his parents or have any bond with them.

{¶ 53} According to Aggarwal, the parents had her contact information as well as that of their interpreter and knew how to reach her and the interpreter. She stated that it was the parents' responsibility to arrange visitation. At the time of the November 9, 2015 hearing on the "Motion to Transfer Foster Care," counsel for Father indicated that he had not had contact with Father since the August 2015 hearing.

{¶ 54} Finally, Aggarwal testified that R.M. was "doing great" in foster care, and that he has a strong bond with his foster parents and the other children in the home. She stated that it is the only home he has ever known. Aggarwal stated that his basic and special needs are being met there, and that he is included in vacations and church retreats. She stated that his foster parents are loving and supportive of him, and that they want to adopt him.

{¶ 55} Given the comprehensive efforts demonstrated by MCCS to provide services, referrals and visitation opportunities to Father, given Father's inability to maintain a bond with R.M. and support him in the nine months leading up to Father's motion to transfer, despite being repeatedly advised of the importance to do so, and

given Aggarwal's testimony that R.M. was thriving in foster care, we conclude that the juvenile court did not err in adopting the magistrate's decision overruling Father's "Motion to Transfer Foster Care." Accordingly, Father's assigned error is overruled. For the foregoing reasons, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . ..

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Meagan D. Woodall
Joyce M. Deitering
Ann Ratcliff, Guardian Ad Litem
Hon. Anthony Capizzi