[Cite as *In re A.H.*, 2021-Ohio-1577.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF: A.H.

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. Patricia A. Delaney, J.
Hon. Earle E. Wise, Jr., J.

Case No. 2020 CA 00072

O P I N IO N

CHARACTER OF PROCEEDINGS:     Appeal from the Licking County Court of
                              Common Pleas, Juvenile Division, Case
                              No. F 2018-0443

JUDGMENT:                     Vacated and remanded

DATE OF JUDGMENT ENTRY:       May 4, 2021

APPEARANCES:

For Appellee - L.C.J.F.S.                For Appellant – Charles Holmes

WILLIAM C. HAYES                         JERMAINE L. COLQUITT
Licking County Prosecutor                33 W. Main Street, Suite #109
                                         Newark, Ohio 43055
PAULA M. SAWYERS
Assistant Prosecuting Attorney           For Mother – Noel Holmes
20 S. Second Street, Fourth Floor
Newark, Ohio 43055                       BONNIE VANGELOFF
                                         P.O. Box 4174
Guardian Ad Litem                        6400 Emerald Parkway
                                         Dublin, Ohio 43016
SCOTT SIDNER
55 South Main Street, Suite C
Johnstown, Ohio 43031

*Hoffman, P.J.*

**{¶1}** Appellant Charles Holmes ("Father") appeals the October 29, 2020 Judgment Entry entered by the Licking County Court of Common Pleas, Juvenile Division, which approved and adopted the magistrate's September 25, 2020 decision, recommending Father's parental rights with respect to his minor child be terminated, and permanent custody of the Child be granted to appellee Licking County Job and Family Services ("LCJFS").

STATEMENT OF THE FACTS AND CASE

**{¶2}** Father and Noel Holmes ("Mother")[1] are the biological parents of the Child. Permanent custody of Mother's three older children was granted to LCJFS in February, 2019. Father is the biological father of two of the older children.

**{¶3}** On July 2, 2018, the trial court granted an emergency ex parte order for removal of the Child. On the same day, LCJFS filed a complaint, alleging the Child was dependent due to Father and Mother's mental health and substance abuse issues. The Complaint further alleged Mother tested positive for THC at the Child's birth, Mother lied about being pregnant, neither parent was employed and did not have independent means to support the Child, and Father had moved out of state. In addition, the Complaint noted the concerns which led to LCJFS becoming involved with the three older children remained, to wit: substance abuse, mental health issues, domestic violence, and economic instability. The trial court granted emergency shelter care custody of the Child to LCJFS on July 3, 2018. The trial court appointed Attorney Scott Sidner as Guardian ad Litem for the Child.

---

[1] Mother is not a party to this Appeal.

{¶4} Following an adjudicatory hearing on September 4, 2018, the magistrate found the Child to be dependent. The trial court conducted semi-annual review hearings on October 25, 2018, and April 25, 2019, and maintained the status quo each time. LCJFS filed a motion for permanent custody on May 29, 2019. On August 14, 2019, Mother filed a motion to grant legal custody of the Child to maternal grandparents or, in the alternative, maternal great aunt and uncle.

{¶5} The magistrate conducted the permanent custody hearing on July 6, September 22, and September 23, 2020.

{¶6} At the close of evidence on the first day of the hearing, Father made an oral motion pursuant to the Interstate Compact on the Placement of Children ("I.C.P.C."), requesting LCJFS initiate the I.C.P.C. study of Father's home in North Carolina. The magistrate scheduled the motion for a "non-oral hearing to allow any party to file a response should they wish to do so." August 5, 2020 Magistrate's Decision.

{¶7} LCJFS filed a memorandum contra on July 10, 2020, arguing the motion was untimely. LCJFS explained, before another state approves an I.C.P.C., an agency must gather "a significant amount of demographic information from the party who intends to accept placement." July 10, 2020 Memorandum Contra to Father's Oral Motion for ICPC at 1, unpaginated. LCJFS detailed the efforts made by the social worker to obtain the necessary information from Father and Father's brother. The GAL filed a response on July 10, 2020, also arguing Father's request was untimely. The GAL noted: "The need for an ICPC in this case is not a matter newly discovered by Father. In fact, the undersigned has mentioned that no ICPC had been requested by Father it [sic] in previous GAL Reports in this case and/or the siblings' case." July 10, 2020 GAL's Response to

Father's Request for ICPC at 2. The GAL added Father testified about the ICPC requirement during the February, 2019 permanent custody trial involving the Child's siblings.

**{¶8}** Via Decision filed August 5, 2020, the magistrate denied Father's motion for an I.C.P.C. home study. The magistrate found "this request has simply been made too late." *Id.* at 2, unpaginated. The magistrate added, "While [counsel for Father] did seek to initiate a home study for his client much earlier in the case, his efforts were thwarted by his client's brother, and it appears by his client as well." *Id.* The magistrate also noted the matter had been pending over two years and granting the request would delay permanency for the Child. *Id.*

**{¶9}** Rebecca Inboden, an on-going social worker, testified she was assigned to the family in May, 2017, when the three older children were placed in the custody of LCJFS. Inboden indicated Father and Mother are legally married, but are separated. The Child was born during the pendency of the case involving the older children. At the time of the Child's birth, the concerns which resulted in the removal of the older children remained, including substance abuse, mental health, domestic violence, financial stability and housing. Father and Mother were non-compliant with case plan services, not engaging in any services, and failing to address any of the issues of concern.

**{¶10}** Inboden met with Mother at the hospital on July 2, 2018, and reviewed the case plan with her. Mother had denied being pregnant when Inboden asked her during a conversation on May 9, 2018. Inboden did not learn of Mother's pregnancy until the Child was born. Father had moved to North Carolina the week prior to the Child's birth. During a telephone conversation on June 21, 2018, Father informed Inboden he had

moved and he and Mother were separating.  Father did not disclose Mother's pregnancy during the conversation.

{¶11} A copy of the case plan was mailed to Father.  Father's case plan included mental health and substance abuse services, obtain and maintain stable housing and employment, and address domestic violence issues.  Inboden stated Father's income appears to be sufficient as he receives monthly VA benefits and is employed at a grocery store earning approximately $14.50/hour.  Inboden did not have verification of Father's residence, but it was her understanding Father was residing with his brother.

{¶12} During the course of the case involving the older children, Father had positive drug screens, the majority of which were for marijuana.  Father completed an intake at the Licking County Alcohol Prevention Program ("LAPP") in September, 2017.  Father did not follow through with the recommended services.  He completed another assessment at LAPP in February, 2020.  Father was advised to follow the recommendations from the 2017 intake.  At the time of the hearing, Father had not followed through with the recommendations.  Father had negative drug screens in 2020.

{¶13} Inboden noted it had been relatively difficult to assist Father with the case plan due to the physical distance.  Her primary means of communicating with Father was through email.  Inboden expressed concerns about Father's ability to parent the Child "because there are things I can't – I can't verify with father at this point."  Transcript July 6, 2020 Hearing at 21.  Father participated in parenting classes during the case involving the older children.

{¶14} Inboden stated Father's visits with the Child "go really well."  July 6, 2020 Tr. at 28.  Father is appropriate and engaged.  Although the Child appears happy to see

Father, Inboden would not go so far to say the Child is bonded with Father. Father's attorney advised Inboden Father's brother was interested in being considered as a potential placement option for the Child. In September, 2019, Inboden contacted Father's brother, who lives in North Carolina. Inboden described Father's brother as "caught off guard by my call." *Id.* at 34. Father's brother told Inboden, "I don't know what I could tell you." He indicated he needed to call Inboden back and would do so within 30 minutes. Inboden never received a return call.

**{¶15}** With respect to the best interest portion of the hearing, Inboden testified the Child is two years old. He is placed in a foster home with two of his older brothers, and has been in the home since his initial removal from Parents' care. The Child receives full-time services through Early Head Start due to speech delays. The Child is well adjusted and is bonded with his biological brothers, his foster siblings, and his foster parents. All of his needs are being met. The foster parents are in the process of adopting the two older children and are interested in adopting the Child. Inboden indicated alternative relative placement was not approved by LCJFS due to various concerns.

**{¶16}** Nicole McCullough testified on the final day of the hearing. McCullough was assigned to the family as the ongoing social worker in August, 2020, after Inboden left LCJFS. McCollough met Parents following the July 6, 2020 hearing. Thereafter, Father texted McCollough with his contact information and address. In an August 21, 2020 email, McCullough asked Father to send an updated paystub, which he did on September 6, 2020. McCullough asked Father if he had completed the LAPP recommendations from his initial intake, which was the recommendation following his February, 2020 mental health assessment. Father indicated the recommendations were no longer valid.

McCullough described Father's visits with the Child as appropriate, and indicated Father loved the Child. McCullough had not heard from Father's brother. Father did not provide McCullough with any photographs of his residence. Father did not provide the social worker with a lease.

{¶17} On cross-examination, McCullough admitted she had not seen Father's home and had not asked Father for photographs or a virtual tour of the home. McCullough stated she did not have any contact with Father's brother. On redirect, McCullough testified Father did not offer or ask her whether she wanted photographs or a virtual tour of the home. McCullough added Father did not ask her to come to the home or ask her to speak with his brother.

{¶18} Inboden was recalled on the final day of the hearing. She testified, during her involvement in the case, Father had not successfully completed any form of substance abuse treatment. Inboden stated, following his September, 2017 intake, LAPP recommended Father participate in individual outpatient therapy. Father attended only one session. He declined further services. Following his February, 2020 mental health assessment, LAPP recommended Father follow through with the September, 2017 recommendation with regard to substance abuse treatment. Inboden continued to have concerns about Father's substance abuse as she had no documentation showing he had completed any treatment.

{¶19} Inboden learned at the previous day's hearing Father had moved to Raleigh, North Carolina, from Zebulon, North Carolina, and he had been living in Raleigh for a year. Inboden recalled she spoke with Father's brother in September, 2019. When she asked him if he was interested in having the Child placed in his home, Father's brother

was hesitant, commenting he did not know what to say.  Inboden was unable to obtain any information regarding the suitability of the home.  Although Father's brother advised Inboden he would call her back, he never did.  Father emailed Inboden wanting to know why she contacted his brother.  According to Inboden, Father "seemed a little perturbed that I had contacted his brother."  Tr. Vol. III at 168.

{¶20} With respect to the decision not to do the I.C.P.C. home study, Inboden explained it is a lengthy application process and she had been unable to obtain information about Father's living situation and was not provided with any other information necessary for the home study.  Father's brother did not call Inboden back to give her the information she requested, including the social security numbers dates of birth, and places of employment for all household members over the age of 18.  Father was aware of the information needed, but also failed to provide such to Inboden.  Inboden added Father had sufficient income and resources to secure independent housing, yet he chose not to do so.

{¶21} Inboden still had concerns regarding Father's lack of progress on his case plan. With respect to Father's negative drug screens, Inboden noted she only had access to Father when he was in Ohio for scheduled visitation with the Child and Father was aware he would be drug screened at that time.  Inboden explained she prefers random drug screens so a parent is unable to prepare and there is more validity to the results.

{¶22} On cross-examination, Inboden acknowledged she did not attempt to contact Father's brother a second time.  She explained, "I guess if I'm placing a child with an individual who is going to be responsible for caring for that individual, I would want to know that that individual is invested and they're motivated to want to reunify with that

individual on their own without me having to constantly pursue it." *Id.* at 174. Inboden added, "I mean, it's not my norm to call somebody to ask them to take a – to take a child on unless I have reason to believe that this is really something that they want to do." *Id.* Inboden admitted she had not asked Father for photographs or a virtual tour of the home. When asked by counsel for Mother, Inboden stated an ICPC was never initiated or completed.

**{¶23}** On cross-examination, Inboden stated Father's last positive drug test was in 2019. Inboden could not recall whether it had been an entire year or just several months since Father's last positive drug screen. Indoben was asked to read aloud the screening impression of Father's February, 2020 LAPP assessment. Inboden stated: "Cannabis use disorder in full sustained remission is the diagnostic language that they use. Methamphetamine use disorder, full sustained remission. Problem related to legal circumstances." Tr. Vol. II at 171-172. Inboden then read the recommendations and treatment: "Complete abstinence from alcohol and all non-prescribed medication. Regular urine and breathalyzer testing. Regular attendance at AA and NA if beneficial. And complete the assessment process at this agency. NO further services are currently indicated." *Id.* At 172. Inboden acknowledged the assessment did not recommend outpatient treatment. Inboden noted Father was typically only screened when he was in Ohio, and conceded she had not asked for assistance with screening from any other agency. Inboden admitted Father seemed bonded with the Child and she has no reason to believe the Child would be unsafe with Father.

**{¶24}** The Guardian ad Litem, Scott Sidner, filed his report on June 29, 2020, and a supplemental report on September 22, 2020, which was authored on September 21,

2020.  Sidner recommended permanent custody of the Child be granted to LCJFS.  The GAL expressed concerns about Father's history of substance abuse and Father's housing situation, which he did not believe was stable.  Sidner acknowledged he had not visited Father's home in North Carolina and had not requested funds to make the trip.

**{¶25}**  Sidner observed Father and the Child during visitation.  He noted the Child gravitates toward Father, and believes Father and the Child have a bond.  Sidner visited the Child in his foster home.  The Child is bonded with his foster parents.  The Child has been in the home for a substantial period of his short life.  Sidner opined, other than visitation, Father has not completed his case plan.

**{¶26}**  Sidner was permitted to make a statement.  He explained the trial court's July 22, 2019 Judgment Entry, granting permanent custody of the three older children to LCJFS, acted as a "blueprint of what the Court was looking for, deficiencies and good things, that could be used for [the Child'] case to show the parents as to what the Court's looking for, this is what needs to be done, and it just wasn't done."   Tr. Vol. III at 201.

**{¶27}**  In its July 22, 2019 Judgment Entry, which was admitted as State's Exhibit 2, the trial court found Father "was aware of the requirement of the I.C.P.C. for placement of the children out of state, be that with him or with his brother."  *Id.* at 4.  The trial court continued:

> [Father] is residing in North Carolina.  Pursuant to Article III(A)(1), Interstate Compact for the Placement of Children (codified at Revised Code 5103.20, commonly called the I.C.P.C., a placement with [Father] would need to meet the requirements of the I.C.P.C.  The I.C.P.C. applies to cases

involving 'the interstate placement of a child subject to ongoing court jurisdiction in the sending state, due to allegations or findings that the child has been abused, neglected or deprived as defined by the laws of the sending state * * *.' As such, the I.C.P.C. applies to this case. Article VI(A) then states that 'no child subject to this compact shall be placed into a receiving state until approval for such placement is obtained.' In Article VI(B), the Compact states that if 'the public child placing agency in the receiving state does not approve the proposed placement then the child shall not be placed.' There is no approval from North Carolina for the placement of the children with [Father].

Id. at 11.

**{¶28}** Father testified on his own behalf. He stated he had completed his drug and alcohol, and mental health assessments. Based upon the recommendations, Father believed he had completed those two case plan objectives. Father lived with his brother and his family in a six-bedroom home in North Carolina. A bedroom is designated for the Child. Although Father's name is not on the lease, Father pays his brother $200/month as rent. Father's brother was unable to attend the hearing because he could not get the time of from work. Father receives $1300/month in VA benefits. He also works 40 hours/week at Food Lion, a grocery store, and earns $14.28/hour. Father has a driver's license, owns a car, and maintains insurance on the vehicle.

**{¶29}** Father flies to Ohio bi-weekly for visits with the Child. He explained he flies into Columbus, stays overnight in a hotel, then travels by bus to Newark for his visits.

Father indicated he looks forward to the visits and the visits are "great." He is bonded with the Child. Father explained the expense of traveling to Ohio has prevented him from obtaining his own housing. According to Father, he provided Inboden with his address when he initially moved to North Carolina and subsequently with his current address before she contacted his brother. Father testified he has not received any emails or telephone calls requesting an address. Father also stated he was not asked to provide a virtual tour of the home.

{¶30} Father denied having admitted during a previous hearing he was diagnosed with post-traumatic stress disorder, but acknowledged he suffers from anxiety. Father conceded he had a history of marijuana use, but denied ever using methamphetamines. He stated he had not used alcohol since 2012, and denied telling LAPP during his 2017 drug and alcohol assessment he used alcohol on a weekly basis.

{¶31} The magistrate issued a decision on September 25, 2020, recommending Father's parental rights be terminated and permanent custody of the Child be granted to LCJFS. The magistrate found, "As to [Father], his biggest impediment to placement at the start was his residence in North Carolina. * * * this continued residence and the absence of an approved I.C.P.C. home study remains the only real impediment in his efforts to reunify with [the Child]." *Id.* at 5.

{¶32} Father filed objections to the Magistrate's Decision on October 9, 2020. LCJFS filed its response thereto on October 20, 2020. Via Judgment Entry filed October 29, 2020, the trial court overruled Father's objections, and approved and adopted the magistrate's decision as order of the court.

**{¶33}** It is from this judgment entry Father appeals, raising the following assignments of error:

I. THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY OF [THE CHILD] TO LCJFS IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE. LCJFS DID NOT PROVE THAT [THE CHILD] CANNOT OR SHOULD NOT BE PLACED WITH APPELLANT-FATHER AND DID NOT PROVE THAT GRANTING THE PERMANENT CUSTODY MOTION WAS IN THE CHILD'S BEST INTEREST. R. AT 107; 126.

II. LCJFS FAILED TO MAKE REASONABLE EFFORTS IN REUNIFYING THE CHILD BECAUSE IT REFUSED TO CONDUCT AN INTERSTATE COMPACT STUDY OF THE APPELLANT'S HOME IN NORTH CAROLINA. R. 107; 126.

**{¶34}** This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

II

**{¶35}** We elect to address Father's second assignment of error first. Therein, Father asserts LCJFS failed to make reasonable efforts in reunifying Father and the Child because LCJFS refused to initiate an I.C.P.C. home study.

**{¶36}** Prior to an award of permanent custody to a public children services agency, the trial court must determine whether the agency has made "reasonable efforts

to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1).

**{¶37}** Although R.C. Chapter 2151 does not define "reasonable efforts," courts construe the term to mean " '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]' " *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2017-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21 (Citation omitted).

**{¶38}** The Interstate Compact on the Placement of Children is a contract among member states and U.S. territories authorizing them to work together to ensure children who are placed across state lines for foster care or adoption receive adequate protection and support services. See, R.C. 5103.20, Article I, Section (A)-(C). Article V of the I.C.P.C. provides, "Prior to sending, bringing, or causing a child to be sent or brought into a receiving state, the public child placing agency shall provide a written request for assessment to the receiving state." *Id.*, Sec. (A). In addition, "[u]pon receipt of a request from the public child welfare agency of the sending state, the receiving state shall initiate an assessment of the proposed placement to determine its safety and suitability." *Id.*,

Sec. (D). We note the statute appears to place the responsibility for requesting the assessment on the public child placing agency, not on the parent.

**{¶39}** The parties direct this Court's attention to three decisions which address the I.C.P.C. and whether a children services agency used reasonable efforts to reunify the parent and the child: *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096; *In re: R.M.*, 2nd Dist. Montgomery No. 27318, 92 N.E.3d 382, 2017-Ohio-4325; and *Matter of G.O.*, 5th Dist. Licking No. 2019CA0037, 2019-Ohio-4547. While these decisions are factually distinguishable from the matter before us, we, nonetheless, find them instructive. We review each in turn.

**{¶40}** In *In re Secrest*, supra, the Second District Court of Appeals reversed the trial court's grant of permanent custody, holding the Montgomery County Children's Services ("MCCS") failed to make a reasonable effort to reunify Mother and her daughter.[2] *Id.* at ¶¶20, 27.

**{¶41}** In April, 2000, the trial court adjudicated Mother's children to be dependent and awarded temporary custody to MCCS. *Id.* at ¶5. Pursuant to the case plan, Mother was required to attend all medical, counseling, and educational appointments for the child and to complete both a "parenting and psychological assessment." *Id.* In September, 2000, Mother moved to Pennsylvania and married. *Id.* at ¶6. She contacted a social worker in her county regarding transferring the children to Pennsylvania. *Id.* A Pennsylvania social worker informed MCCS Mother's home in Pennsylvania was "nice" and "clean." *Id.* Mother's husband was employed and Mother was financially able to stay

---

[2] Although there were three children subject to MCCS's complaint, the appeal addressed only one child.

at home. *Id.* MCCS refused to transfer the case, instead requesting Mother to return to Ohio and complete her case plan. *Id.* at ¶7.

**{¶42}** MCCS filed motions for permanent custody of the children on November 29, 2000. *Id.* at ¶8. Following hearings in April and October, 2001, the magistrate recommended permanent custody of two of the children be awarded to MCCS. *Id.* The magistrate recommended the third child be placed in a permanent planned living arrangement. *Id.* Mother filed objections to the magistrate's decision, which the trial court overruled. *Id.*

**{¶43}** On appeal, Mother argued "the trial court erred in granting permanent custody to MCCS because the agency failed to make a reasonable attempt to reunify the family." *Id.* at ¶11. The Second District Court of Appeals found the record did not demonstrate Pennsylvania would not have accepted the transfer of the case, and it appeared a transfer would be possible under the I.C.P.C. *Id.* at ¶19. The Court noted "MCCS did not seriously consider the possibility of transferring the case, and did not pursue that option. Instead, it appears that MCCS determined that because [Mother] had failed to travel to Ohio to comply with the case plan, it would not attempt to seek any alternative avenues aimed at reunification." *Id.* The Court concluded, "by failing to give serious consideration to this possibility [of transferring the case to Pennsylvania], MCCS failed to make a reasonable effort to reunify the family," and the record did not support the trial court's finding MCCS made a reasonable attempt to reunify the family. *Id.* at ¶ 20.

**{¶44}** Next, in *In re: R.M.*, supra, the Second District Court of Appeals found the trial court properly determined transferring foster care of the child, who had special needs, closer to Father's residence in New York was not in the child's best interest. *Id.* at ¶55.

**{¶45}** R.M. was born in September, 2013, at 32 gestational weeks. The newborn had brain and kidney problems, was on a ventilator, and had a feeding tube. *Id.* at ¶2. R.M. was placed in the custody of MCCS following his discharge from the hospital. *Id.* Parents were making progress on their case plan objectives and temporary custody was extended. *Id.* at ¶6. In December, 2014, Parents contacted MCCS and advised they had moved out of state to live with a relative and look for work.[3] *Id.* at ¶8. Parents stated they intended to return to Ohio in two months. *Id.* When MCCS's subsequent attempts to contact Parents were unsuccessful, the Agency moved for a second extension, indicating Parents' whereabouts were unknown. *Id.* at ¶8-9. MCCS moved for permanent custody on July 22, 2015. *Id.* at ¶10. In the affidavit in support, MCCS averred phone contact was finally made with Parents in July, 2015; Parents were living in New York; and Parents provided MCCS with proof of housing, income, and benefits. *Id.* MCCS requested New York complete an interstate home study to determine if Parents' home was appropriate for R.M. *Id.*

**{¶46}** Counsel for Father filed a Motion to Transfer Foster Care on September 22, 2015. *Id.* at ¶11. MCCS filed an amended motion for permanent custody on September 24, 2015. *Id.* The trial court scheduled a hearing on the motion for November 9, 2015. *Id.* Father did not appear at the hearing on the motion for permanent custody. *Id.* at ¶12.

---

[3] There was confusion as to whether Parents moved to Virginia or Georgia.

**{¶47}** At the hearing on the motion for permanent custody, evidence was presented relative to Father's motion to transfer foster care.  The magistrate overruled the motion, noting "[t]his decision is being made in the best interest of the child, as the child has had his primary needs met in the last few years by this current foster placement and he needs continuity of care." *Id.* at ¶ 21.  The magistrate continued with evidence relative to the permanent custody portion of the hearing, and ultimately recommended permanent custody be granted to MCCS.  *Id.* at ¶ 31.  Father filed objections to the magistrate's decision, which the trial court overruled.  *Id.* at ¶¶ 34, 39.

**{¶48}** On appeal, Father argued the trial court erred in granting permanent custody to MCCS as the agency failed to make reasonable efforts to reunify the family by refusing to transfer the case.  *Id.* at ¶ 42.   Father relied upon *Secrest*, supra, in support of his position.  *Id.* at ¶46.  The Court distinguished *Secrest*, noting the mother therein was bonded with her children unlike R.M., who did know his parents and did not have a bond with them.  *Id.* at ¶50.  The child had been placed in foster care in September 2013, when he was one month old.  *Id.* at ¶ 51.  Unlike the *Secrest* mother, who sought the transfer of her children at the time of her move to Pennsylvania, Father did not file his motion to transfer until September 22, 2015, after the parents had been out of state for nine months, and after MCCS sought permanent custody following two extensions of temporary custody.  *Id.*

**{¶49}** In overruling Father's assignment of error, the Second District noted the comprehensive efforts demonstrated by MCCS to provide services; Father's inability to maintain a bond with R.M. and support the child in the nine months leading up to Father's

motion to transfer, despite being repeatedly advised of the importance to do so; and the testimony R.M. was thriving in foster care. *Id*. at ¶55.

**{¶50}** Third, in *Matter of G.O.*, supra, this Court determined the Licking County Department of Jobs and Family Services made reasonable efforts to reunite Mother with her child despite LCJFS's failure to request an I.C.P.C. home study from the state of California, where Mother was residing. This Court specifically found the failure of LCJFS to initiate an I.C.P.C. home study was harmless as the outcome would not have changed given the facts of the case. *Id*. at ¶45.

**{¶51}** G.O. was a child with special needs. *Id*. at ¶13. Grandfather was given legal custody of G.O. in 2009, when the child was a year old, due to Mother's alcohol and drug abuse. *Id*. at ¶2. In December 2009, Mother moved to California. *Id*. at ¶6. Mother did not seek transfer at the time she moved to California. *Id*. at ¶48. In 2017, when Grandfather was no longer able to care for G.O., LCJFS filed a complaint alleging G.O. was a dependent child. *Id*. at ¶3. The trial court found G.O. to be a dependent child. *Id*. Mother did not appear for the adjudicatory hearing. On July 13, 2018, LCJFS filed a Motion for Permanent Custody. *Id*. at ¶4. At that point, Mother had not seen G.O. since a short visit in 2013. *Id*. at ¶6. Mother filed a motion for legal custody or, in the alternative, an extension of time to continue working on her case plan on October 1, 2018. *Id*. at ¶4.

**{¶52}** Mother did not begin engaging in her case plan services until after LCJFS filed the motion for permanent custody. *Id*. at 18. Mother never sought custody or visitation of G.O. in the Licking County Court of Common Pleas, Juvenile Division, at any time prior to the filing of the motion for permanent custody. *Id*. at ¶46.

**{¶53}** The magistrate issued a decision on March 13, 2019, recommending permanent custody of G.O. be granted to LCJFS. *Id.* at ¶22.  On the same day, Mother filed a motion to commence an I.C.P.C., requesting the trial court order LCJFS to commence and cooperate with the receiving state, California, for potential placement of G.O. with Mother.  *Id.* at ¶24. The trial court denied the motion as untimely as such was filed after permanent custody had been granted, adding an I.C.P.C. is not required if the Agency does not plan to place the child out-of-state. *Id.* at ¶25.

**{¶54}** On appeal, Mother argued, inter alia, LCJFS failed to make reasonable efforts to reunify the family because it refused to conduct an I.C.P.C. study of Mother's home in California.  *Id.* at ¶29.  Mother relied upon *Secrest*, supra, in support of her position.  *Id.* at ¶48.

**{¶55}** This Court found *Secrest*, supra, was distinguishable, noting there was no evidence presented to establish California would have accepted a transfer of the case. *Id.*  Further, there was no evidence G.O. was bonded to Mother.  *Id.*  After Mother lost custody in 2009, she moved to California in 2010, and had no face-to-face or telephone contact with G.O.  *Id.* at ¶49.  Unlike the mother in *Secrest*, supra, Mother did not seek transfer at the time she moved to California.

**{¶56}** This Court concluded the trial court's finding LCJFS made reasonable efforts at reunification was supported by clear and convincing evidence.  *Id.* at ¶57.  We further noted, "[a]lthough LCJFS could have made a referral for an ICPC, the record establishes by clear and convincing evidence that Appellant-mother could not manage the complex and special needs of G.O."  *Id.*

**{¶57}** We now address the matter before this Court in light of these decisions. Unlike the parents in *In re: Secrest*, supra, *In re: R.M.*, supra, and *In re: G.O.*, supra, Father engaged in his case plan services and, despite living in another state, attended all scheduled visitation with the Child. The Child was happy to see Father and gravitated towards him at visitation. Father's visits with the Child "go really well." July 6, 2020 Tr. at 28. Father is appropriate and engaged. Although the Child appears happy to see Father, Inboden would not go so far to say the Child is bonded with Father. The GAL, however, did acknowledge the Child was bonded with Father.

**{¶58}** In his September 25, 2020 decision, the magistrate found:

The biggest issue for [Father] is there is no home study from North Carolina for [Father]. Ms. Inboden testified that at one point in 2018, she contacted [Father] and asked if she could speak with his brother about the case. She then spoke with the brother, who was hesitant when Ms. Inboden asked about having a study done of his home. He indicated he would call Ms. Inboden back and he never did. Ms. Inboden testified that shortly after this call, she received a call from [Father], who was very upset about her speaking with his brother about the case and the home study. Given all of this, Ms. Inboden and Children Services did not initiate a request for a home study under the Interstate Compact for the Placement of Children. * * * As to [Father], his biggest impediment to placement at the start was his residence in North Carolina. * * * this continued residence and the absence

of an approved I.C.P.C. home study remain the only real impediment in his efforts to reunify with [the Child].

> * * * the undersigned was highly persuaded by the testimony of Mr. Sidner, when he described how the decision filed in the summer of 2019 on the siblings case provided a blue print for [Father] to seek an I.C.P.C. home study in order to pursue reunification.  [Father] did nothing to pursue a home study until the first day of this hearing had ended.  This was two years after [the Child] had been placed in care.  As the undersigned wrote in the decision regarding that motion for an I.C.P.C. home study, such a home study would delay this case for months.  This case began on July 2, 2018, so it is already beyond the two-year mark, due in no small part to the COVID-19 pandemic.  [Father] waited too long by asking in 2020 to do what Ms. Inboden had tried to start in 2018.

> *Id.* at 4-6.

{¶59} The magistrate made it abundantly clear, the "biggest impediment to placement" of the Child with Father was the lack of an approved I.C.P.C. home study. Father advised LCJFS he was living in North Carolina with his brother in June, 2018, at the start of the case.  Although unclear as to when, Father's attorney advised Inboden Father's brother was interested in being considered as a potential placement option for the Child.   Inboden made a single attempt to speak with Father's brother in September, 2019.  When questioned about why she did not inquire further, Inboden explained she "wanted to know that that individual is invested and they're motivated to want to reunify

with that individual on their own *without me having to constantly pursue it.*" Tr. Vol. III at 174. (Emphasis added). Inboden conceded she never initiated an I.C.P.C. Likewise, McCullough made no attempt at all to contact Father's brother or initiate a home study.

**{¶60}** The burden is on LCJFS to make reasonable efforts to reunify the family. The burden is not on Father. Yet, the trial court and LCJFS shifted the burden to Father. Although Father may not have made a formal request for an I.C.P.C. home study until after the permanent custody hearing commenced, his actions from the beginning of the case revealed his desire to be reunified with the Child.

**{¶61}** We do not intend by this Opinion to require North Carolina to approve Father's home. However, we find, by failing to consider this possibility, LCJFS failed to make a reasonable effort to reunify the Child with Father. We conclude the record before us does not support the trial court's finding LCJFS made a reasonable attempt to reunify Father and the Child.

**{¶62}** Father's second assignment of error is sustained.

I

**{¶63}** In light of our disposition of Father's second assignment of error, we find his first assignment of error to be premature.

{¶64} The judgment of the Licking County Court of Common Pleas, Juvenile Division, is vacated and the matter remanded in order for LCJFS to initiate an I.C.P.C. home study with the appropriate agency in the state of North Carolina.


By: Hoffman, J.

Delaney, J. and

Wise, Earle, J. concur