[Cite as *In re J.C.*, 2021-Ohio-1874.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| IN RE J.C. | : | |
| | : | Case No. 20 CAF 12 0057 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:        Appeal from the Delaware County Court
                                of Common Pleas, Juvenile Division,
                                Case No. 19-01-0037AB

JUDGMENT:                       AFFIRMED

DATE OF JUDGMENT ENTRY:         June 2, 2021

APPEARANCES:

For Mother-Appellant:                   For DCDJFS-Appellee:

DONALD G. WORLY                         MEGAN A. HAMMOND
43 E. Central Ave.                      145 N. Union St., 3rd Floor
Delaware, OH 43015                      Delaware, OH 43015

*Delaney, J.*

{¶1} Appellant-Mother appeals the November 30, 2020 judgment entry of the Delaware County Court of Common Pleas, Juvenile Division awarding permanent custody of her minor child, J.C. to the Appellee-Delaware County Department of Job and Family Services.

## FACTS AND PROCEDURAL HISTORY

### Union County Proceedings

{¶2} Appellant-Mother is the biological mother of J.C., born on October 14, 2018. At the time of J.C.'s birth, Mother was residing in Union County. On October 18, 2018, Union County Child Protective Services filed an ex-parte order to have J.C. placed in its temporary custody due to concerns about Mother's ability to care for J.C. When Mother was a child, she was diagnosed with mild intellectual disability and post-traumatic stress disorder. Union County CPS observed that Mother was not able to properly meet the needs of J.C. in the areas such as feeding and diapering due to Mother's cognitive delays. Familial placement was not possible because Mother's family had prior involvement with Children's Services and the biological Father of J.C. had a criminal history and admittedly used drugs. J.C. was placed with a foster family. Mother had supervised visitation.

{¶3} The Union County Court of Common Pleas, Juvenile Division, held an adjudication hearing on January 7, 2019, where the court dismissed the case for lack of evidence on the issue of dependency. On January 8, 2019, J.C. was returned to Mother's custody. At this time, she resided in Delaware County.

**Delaware County Proceedings**

{¶4} On January 8, 2019, Appellee-Delaware County Department of Job and Family Services ("DCDJFS") received a referral regarding J.C. DCDJFS opened a case and two caseworkers visited with Mother in her home. Mother resided in the home with her boyfriend, W.L. and another couple. The caseworkers observed the home was in poor condition and Mother struggled to care for J.C. due to Mother's cognitive delays and lack of support. After investigation, it was determined there was no familial placement available. DCDJFS made an oral motion for ex-parte removal and temporary custody of J.C. The Delaware County Court of Common Pleas, Juvenile Division granted the ex-parte removal. J.C. was placed in the care of the foster family residing in Union County.

{¶5} On January 9, 2019, DCDJFS filed a Complaint of Dependency. The shelter care hearing was held on January 9, 2019. Counsel represented mother. The magistrate found there was probable cause for J.C.'s removal. The magistrate ordered a Guardian ad Litem be appointed for both Mother and J.C.

{¶6} On January 11, 2019, the trial court appointed a Court Appointed Special Advocate ("CASA") for J.C.

{¶7} DCDJFS filed a case plan with the trial court on February 6, 2019. The case plan required Mother to engage in the following activities: (1) undergo an assessment with Delaware County Board of Developmental Disabilities to determine if she qualified for services; (2) follow any recommendations for ongoing services or community support; (3) find and maintain stable housing with the ability to ensure her financial needs; and (4) attending a parenting program of her choice or utilize the M.O.M.S. program. Mother was

given supervised weekly visitation with J.C. Father was also listed on the case plan, but he asked to be removed from the case plan in April 2019.

{¶8} On February 22, 2019, counsel for Mother filed a motion to determine Mother's competence to stand trial. The trial court denied the motion.

{¶9} The adjudication hearing was held on April 4, 2019. The magistrate found J.C. was a dependent child under R.C. 2151.04(C). The case plan filed on February 6, 2019 was adopted as a court order. Mother did not file objections to the April 4, 2019 Magistrate's Decision.

{¶10} On April 5, 2019, J.C. was placed with a foster-to-adopt family located in Delaware County.

{¶11} Mother's GAL filed an Application for Appointment of Guardian of Alleged Incompetent on June 7, 2019 with the Delaware County Probate Court. On September 6, 2019, the Delaware County Probate Court found Mother was incompetent and incapable of taking care of her individual activities of daily living due to a diagnosed mild developmental disability. It appointed Mother's GAL as her Guardian.

{¶12} Mother's second child, H.L., was born on April 28, 2020. H.L.'s father was W.L., Mother's boyfriend. DCDJFS was granted temporary custody of H.L. shortly after the child's birth due to the same concerns underlying J.C.'s removal. H.L. is not the subject of this appeal.

{¶13} DCDJFS filed a motion for permanent custody on June 2, 2020, and an amended motion for permanent custody on June 4, 2020. The motion stated that J.C. had been in the temporary custody of DCDJFS for 12 or more months of a consecutive 22-month period and that the child could not be placed with either Mother or Father within a

reasonable time. The motion further stated it was in the best interests of J.C. to be placed in the permanent custody of DCDJFS.

{¶14} The trial court held a pretrial on the amended motion for permanent custody on June 8, 2020. At the pretrial, counsel for Mother requested a parenting assessment to help determine what Mother was capable of as a parent and the extent of her disabilities. Mother's Guardian retained Dr. Jamie Adkins, a forensic psychologist, to perform a competency evaluation of Mother on July 29, 2020. Dr. Adkins filed her report with the trial court on September 9, 2020.

### Permanent Custody Hearing

{¶15} The trial court held the hearing on the amended motion for permanent custody on September 25, 2020 and November 23, 2020. The following evidence was adduced at the hearing.

{¶16} Melissa Barber, ongoing caseworker with DCDJFS, testified as to her experiences working with Mother and J.C. Barber's main concern for Mother was her cognitive ability to properly care for J.C. After developing the case plan, Barber testified the role of DCDJFS was to provide information and referral to services, but DCDJFS could not assist Mother in getting those services. For example, Barber referred Mother to the Delaware County Board of Developmental Disabilities ("DCBDD") for an assessment to determine whether she was eligible for services. Mother did not have a driver's license or stable housing and DCBDD could assist Mother obtaining transportation and housing.

{¶17} Mother completed her assessment with DCBDD. It was determined that she was eligible for several services through DCBDD, including housing assistance, transportation, and in-home services to help with cooking and basic household tasks.

{¶18} Stable housing was of major concern for Mother. For Mother to engage in other services, Mother required stable housing. Barber was assigned as the case worker in February 2019. Since her time on the case, Mother had moved eight to ten times, residing with her biological family, J.C.'s original foster parents, or friends. Mother was working with Emily Froehlich, a service and support administrator with the DCBDD, to obtain housing and other services through DCBDD. Due to Mother's needs, the housing through DCBDD included a health provider in the home 24/7 and roommates. With the help of Mother's Guardian, they started looking for housing in December 2019 but could not find the appropriate housing situation and it was difficult coordinate with Mother due to her transportation limitations. When the pandemic started, housing became unavailable. Mother was disenrolled from DCBDD in May 2020, but she reenrolled in August 2020.

{¶19} By the time of the hearing, Mother had not obtained stable housing. Froelich stated there was a housing available for Mother in Delaware, but she was not sure it would be appropriate for J.C. The goal of DCBDD was to get Mother into stable housing appropriate for Mother so she could start obtaining services, then they would work on finding housing that was appropriate for Mother and J.C.

{¶20} The other important aspect of the case plan was Mother's parenting skills. DCDJFS does not offer any parenting classes. DCDJFS referred Mother to the M.O.M.S. program, but the program was not tailored for her needs because she did not have stable housing or a child in her care. Mother was offered parenting classes through Early Intervention, but Mother declined. All parties agreed that due to Mother's cognitive delays,

Mother needed one-on-one parenting training, but the DCDJFS, the DCBDD, and the CASA were not aware of any program offering that service.

{¶21} After the permanent custody motion was filed, counsel for Mother requested a psychological evaluation to determine Mother's cognitive ability to parent. The assessment conducted by Dr. Jamie Adkins was filed on September 9, 2020. Dr. Adkins testified as to her assessment of Mother and her ability to parent. Dr. Adkins first administered the Wechsler test, an adult intelligence scale. Mother's full-scale score was 65, which placed her in the middle intellectual functioning disability range. Her verbal comprehension was 61, which was in the middle intellectual functioning range; her perceptual reasoning was 81, which was in the range of a low average to borderline; her working memory was 58 and her processing speed was 79.

{¶22} Dr. Adkins next attempted to administer the Parent Stress Inventory to Mother but was not able to complete the test. The test looks at how a parent handles the basic stresses of being a parent or navigate the nuances that come with parenting. It was a written test that was above Mother's reading comprehension level.

{¶23} Based on her assessment of Mother, it was Dr. Adkins' opinion that at the time of the assessment, Mother did not have the current ability to independently care for her children. Mother had a traumatic childhood, complicated by her intellectual functioning, which prevented her from modeling what parenting should be and how to meet a child's needs. Dr. Adkins recognized that Mother had the desire to be a good parent. Mother would need intensive intervention, training, and modeling on a continuous basis to learn to meet her children's ever-developing needs. The parenting training sessions would be three to five times a week. Dr. Adkins felt that after six months of

intensive intervention, Mother should be reevaluated to determine if Mother had made any progress. In the best-case scenario, if Mother made progress after the six-month review, Dr. Adkins opined that it would be a minimum of one to two years of true interventions, learning, and monitoring to gain more time with supervision for Mother to be independent in certain roles.

{¶24} Barber considered Dr. Adkins' assessment and felt the case plan goals were like the recommendations in the assessment. When asked why the DCDJFS filed the motion for permanent custody before the two-year mark, Barber testified the motion was filed due to Mother's lack of progress on the case plan and that Mother was no longer linked with services.

{¶25} Barber and Foster Mother next testified as to their experiences with J.C. On April 5, 2019, J.C. was placed with a foster-to-adopt family when she was six months old. At the time of the hearing, J.C. was 23 months old. The family lived in Powell in Delaware County. Foster Mother and Foster Father have been married for 23 years and have a 9-year-old adopted son. The parents work outside the home. Barber has observed the foster family with J.C. at least 15 times. J.C. is bonded with the family and refers to her foster parents as "mommy" and "daddy." The foster family has provided for J.C.'s medical care and therapeutic needs.

{¶26} Mother has attended every supervised visitation with J.C., even during the pandemic. The foster family facilitated visitation with Mother during the pandemic by meeting in a park. Mother was appropriate and interacted with J.C. She brought her toys, fed her, and changed her diaper. J.C. was happy to see Mother and had no behavioral

issues after leaving visitation. There was no dispute that Mother loved J.C. and wanted to be her parent.

{¶27} The Guardian ad Litem for J.C. was opposed to permanent custody. The GAL supported legal custody to foster parents and/or extending temporary custody for six months. Foster parents, however, did not want only legal custody of J.C. The GAL was appointed in January 2019, but she met with J.C. and the foster parents once in January 2020 before issuing her report.

{¶28} The CASA for J.C. testified that she observed Mother during two visitations, and she visited the foster home monthly. Her testimony regarding her observations was like Barber's testimony. The CASA had requested a parenting assessment of Mother and Dr. Adkins' assessment confirmed her observations of Mother. The CASA was concerned that Mother's cognitive delays affected Mother's ability to parent, especially in the ability to think ahead on how to handle the child's needs in the future. The CASA recommended that permanent custody be awarded to DCDJFS.

### Judgment Entry

{¶29} On November 30, 2020, the trial court issued an extremely detailed and thoroughly analyzed 24-page judgment entry granting permanent custody of J.C. to the DCDJFS. The trial court first found that J.C. had been in the temporary custody of the DCDJFS for 12 or more months out of a 22-month period.

{¶30} The trial court next analyzed whether the child could be placed with the parents in a reasonable time. The trial court acknowledged that this case was different than other permanent custody matters where the parent has a drug addiction or abuses their child. The trial court stated,

This case, and this factor in particular, turn on the potential timeline for a parent with a developmental disability who loves her child and wishes to parent. The Court must keep two things in mind in its decision-making process. First, a developmental disability does not prohibit a parent from caring for their child, and indeed, the Court has been involved in many cases with parents who have a diagnosis of a developmental disability and who are loving, successful parents, and who raise happy, healthy children in a safe environment. Conversely, while the presence of a developmental disability diagnosis changes the services that a parent may need, and the interventions that may be appropriate, it does not modify other considerations in a case. That is, the Court must still consider whether a child is safe, whether the parent is capable of providing the appropriate environment, and perhaps most importantly in this case, does not affect the stated purpose under the law of providing permanency for a child and not keeping a young child in legal limbo indefinitely.

(Judgment Entry, Nov. 30, 2020).

{¶31} The trial court next found J.C. could not be placed with Mother in a reasonable time pursuant to R.C. 2151.414(D)(2). Mother had been referred to DCBDD, but Mother failed to utilize the services, resulting in her being removed from active service status. She recently reengaged with services through the DCBDD, but the trial court found her failure to take advantage of the services triggered R.C. 2151.414(E), which states the court "shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the

parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

{¶32} The trial court next considered Mother's argument that she should be allowed time to work toward the goals outlined in Dr. Adkins' assessment. The trial court found R.C. 2151.414(E)(4) provided that if a parent's intellectual disability was so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the permanent custody hearing, the trial court must grant the requested relief. There was no dispute Mother's developmental disability was severe enough that she could not parent at the current time. The trial court relied upon Dr. Adkins' assessment that it would take a minimum of one to two years of intensive intervention for Mother to learn parenting skills. It found DCDJFS made reasonable efforts towards reunification by connecting Mother with services addressing her developmental disability, but Mother did not take advantage of the services to their fullest extent.

{¶33} The trial court finally found it was in the best interests of J.C. to be placed in the permanent custody of DCDJFS.

{¶34} It is from the trial court's judgment entry that Mother now appeals.

## ASSIGNMENTS OF ERROR

{¶35} Mother raises four Assignments of Error:

{¶36} "I. WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT FINDING J.C. DEPENDENT. THE TRIAL COURT DECISION IS NOT REFLECTED IN THE TRANSCRIPT.

{¶37} "II. WHETHER THE JUDGMENT ENTRY OF THE TRIAL COURT WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT DECIDED THAT THE DELAWARE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES MADE REASONABLE EFFORTS TO PREVENT REMOVAL OF J.C. FROM ASHLEY CAUDILL AND/OR TO REUNIFY THE CHILD WITH HER MOTHER. THE TRIAL COURT DECISION IS NOT REFLECTED IN THE TRANSCRIPT.

{¶38} "II. WHETHER THE TRIAL COURT DECISION IS AN UNCONSTITUTIONAL APPLICATION OF THE LAW. THE TRIAL COURT DECISION IS REFLECTED IN THE TRANSCRIPT AT T. PAGE 345, LINES 1-13.

{¶39} "IV. THE TRIAL COURT DECISION WAS NOT IN THE BEST INTEREST OF THE CHILD AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN THAT IT DID NOT EXTEND THE CASE FOR SIX MONTHS TO GIVE THE MOTHER TIME TO WORK WITH AN INDIVIDUAL PARENTING INSTRUCTOR AS HAD BEEN RECOMMENDED BY DR. ADKINS. T. PAGE 290, LINES 1-2 AND T. PAGE 283, LINES 17-23. THE TRIAL COURT DECISION IS NOT REFLECTED IN THE TRANSCRIPT."

## ANALYSIS

### I. Dependency

{¶40} Mother contends in her first Assignment of Error that there was insufficient evidence to support the adjudication of dependency. We disagree.

{¶41} The adjudication hearing on the complaint for dependency was held on April 4, 2019. The magistrate issued the Magistrate's Decision on April 19, 2019, which adjudicated J.C. a dependent child pursuant to R.C. 2151.04(C). The judge countersigned

the Magistrate's Decision to approve the same as an order of the court but notified the parties that written objections to the Magistrate's Decision must be filed within 14 days. Written objections would stay the enforcement of the order.

{¶42} Mother did not file objections to the April 19, 2019 Magistrate's Decision adjudicating J.C. a dependent child. Juv.R. 40(D)(3)(b) controls decisions by a magistrate in juvenile cases. The rule provides, in relevant part:

*(3) Magistrate's Decision; Objections to Magistrate's Decision.*

\* \* \*

(b) Objections to Magistrate's Decision.

(i) Time for Filing. A party may file written objections to a magistrate's decision within fourteen days of the filing of the decision, whether or not the court has adopted the decision during that fourteen-day period as permitted by Juv.R. 40(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. If a party makes a timely request for findings of fact and conclusions of law, the time for filing objections begins to run when the magistrate files a decision that includes findings of fact and conclusions of law.

(ii) Specificity of Objection. An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection.

(iii) Objection to Magistrate's Factual Finding; Transcript or Affidavit. An objection to a factual finding, whether or not specifically designated as a finding of fact under Juv.R. 40(D)(3)(a)(ii), shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that finding or an

affidavit of that evidence if a transcript is not available. With leave of court, alternative technology or manner of reviewing the relevant evidence may be considered. The objecting party shall file the transcript or affidavit with the court within thirty days after filing objections unless the court extends the time in writing for preparation of the transcript or other good cause. If a party files timely objections prior to the date on which a transcript is prepared, the party may seek leave of court to supplement the objections.

(iv) Waiver of Right to Assign Adoption by Court as Error on Appeal. Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b).

{¶43} We find that except for a claim of plain error, Mother cannot assign as error the trial court's adoption of the magistrate's adjudication of dependency because Mother did not object to that finding or conclusion as required by Juv.R. 40(D)(3)(b). Mother does not raise plain error in her appellate brief, nor can Mother demonstrate plain error because she did not file a transcript of the April 4, 2019 adjudication hearing. *Stanley v. Parker*, 5th Dist. Muskingum No. CT2020-0050, 2021-Ohio-1701, ¶ 46.

{¶44} An appellant is required to provide a transcript for appellate review. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980). Such is necessary because the appellant shoulders the burden of demonstrating error by

reference to matters within the record. *See, State v. Skaggs*, 53 Ohio St.2d 162, 163, 372 N.E.2d 1355 (1978).

{¶45} This principle is embodied in App.R. 9(B), which states in relevant part:

If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the weight of the evidence, the appellant shall include in the record a transcript of all evidence relevant to the findings or conclusion. App.R. 9(B).

{¶46} Where portions of the transcript necessary for the resolution of assigned errors are omitted from the record, an appellate court has nothing to pass upon. As Mother cannot demonstrate those errors, the Court has no choice but to presume the validity of the lower court's proceedings. *State v. Ridgway*, 5th Dist. Stark No. 1998CA00147, 1999 WL 100349 (Feb. 1, 1999), citing *Knapp, supra*.

{¶47} On this record, we must presume there was sufficient evidence for the adjudication of dependency. Mother's first Assignment of Error is overruled.

## II. and III. Reasonable Efforts and Mother's Second Child

{¶48} In her second Assignment of Error, Mother contends the DCDJFS did not make reasonable efforts towards reunification with J.C. We also consider Mother's third Assignment of Error that argues the trial court's treatment of H.L., Mother's second child, when compared to J.C., violates the Equal Protection Clause. She claims that in contrast to the reunification efforts for J.C., DCDJFS is making more effort to reunite Mother with H.L.

{¶49} R.C. 2151.414(B)(1) states permanent custody may be granted to a public or private agency if the trial court determines by clear and convincing evidence at a

hearing held pursuant to division (A) of R.C. 2151.414, that it is in the best interest of the child and any of the following apply:

(a) The child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period* * *

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶50} Therefore, R.C. 2151.414(B) provides a two-pronged analysis the trial court is required to apply when ruling on a motion for permanent custody. In practice, the trial court will determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶51} A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the

mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954); *In re: Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985). In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *See also, C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel*, 55 Ohio St.3d at 74.

{¶52} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." *Id*. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984): The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v.*

*Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *see, also, In re: Christian*, 4th Dist. Athens No. 04CA10, 2004-Ohio-3146; In re: C.W., 2nd Dist. Montgomery No. 20140, 2004-Ohio-2040.

{¶53} The trial court determined that pursuant to R.C. 2151.414(B)(1)(d), J.C. had been in the temporary custody of DCDJFS for twelve months of a consecutive twenty-two-month period. Mother does not dispute this fact. This Court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody. *Matter of O.M.*, 5th Dist. Coshocton No. 20CA0017, 2021-Ohio-1310, 2021 WL 1424200, ¶ 33 citing *In the Matter of A.S., V.S., and Z.S.*, 5th Dist. Delaware No. 13 CAF 050040, 2013-Ohio-4018. Therefore, a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence. *Matter of L.G.*, 5th Dist. Stark No. 2020-CA-00139, 2021-Ohio-743, ¶ 36. The trial court also determined that J.C. could not be placed with Mother within a reasonable time. As to both determinations, Mother argues DCDJFS did not make reasonable efforts to prevent the removal of J.C., eliminate the continued removal of J.C. from Mother's home, and did not make it possible for Mother and child to reunify.

{¶54} Prior to an award of permanent custody to a public children services agency, the trial court must determine whether the agency has made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1).

{¶55} Although R.C. Chapter 2151 does not define "reasonable efforts," courts construe the term to mean " '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]' " *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting In re C.F., 113 Ohio St.3d 73, 2017-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21 (Citation omitted). *Matter of A.H.*, 5th Dist. Licking No. 2020 CA 00072, 2021-Ohio-1577, 2021 WL 1784353, ¶¶ 36-37

{¶56} Mother argued before the trial court that the assessment of Dr. Adkins was proof that DCDJFS failed to make reasonable efforts towards unification. She also contended the failure to make reasonable efforts is evident when the case plan for J.C. and H.L., Mother's second child, are compared. H.L. was born on April 28, 2020. The child was placed in the temporary custody of DCDJFS on April 29, 2020. Dr. Adkins completed her assessment of Mother on July 30, 2020 and it was filed on September 9, 2020. An adjudication hearing on the complaint for dependency as to H.L. was held on October 7 and 12, 2020. On October 12, 2020, the Magistrate's Decision adjudicated H.L. dependent under R.C. 2151.04(C). The Magistrate's Decision ordered DCDJFS to investigate the availability of one-on-one parenting services like those recommended in Dr. Adkins' assessment and assist Mother with referrals and enrollment into the programs once located.

{¶57} In its November 30, 2020 judgment entry, the trial court responded to Mother's argument as to the reasonable efforts of the DCDJFS for reunification:

Counsel for Mother, and the Guardian ad Litem, did their best to present the report of Dr. Adkins as a positive for the Mother, and as proof that the Department had failed to make reasonable efforts toward reunification. But the Department cannot have failed to comply with recommendations that were not made, nor even requested, until after the motion for permanent custody was filed, and after the child had been in foster care for nearly a year and a half. The parents, their counsel, Mother's guardian, the GAL, and the CASA were all invited to case plan meetings, and provided notice of numerous hearings and case reviews, there was ample opportunity to request modifications, additions, and deletions to the reunification efforts outlined in the case plan. The lack of progress occasioned by the Mother's frequent changes of residence (nine times since the birth of the child), declination of services offered through the DCBDD, and decision not to take advantage of housing opportunities presented to her. While the assessment of Dr. Adkins may have arrived in time to formulate different opportunities for [Mother's] younger child, in this matter the report of Dr. Adkins is actually what conclusively makes the Department's case for permanent custody as it nearly exactly mirrors the statutory findings that instruct the Court to grant the motion, namely that the child cannot be reunified at this time, and could not possibility [sic] be reunified within the next twelve months.

\* \* \*

DCDJFS has made reasonable efforts to reunite the child with the parents in the above captioned case. * * * DCDJFS diligently acted to remedy the reasons for removal in the above captioned case. The Court would be remiss if it did not highlight the testimony of the case worker that in situations involving a parent with developmental disabilities, the Department relies on outside organizations, particularly the DCBDD, to provide services. But the Court does not find that this affects the conclusion as to reasonable efforts. The Department cannot be all things to all persons, and routinely relies on outside providers in areas of mental health, drug and alcohol abuse, educational assistance, and more. The Department made efforts to connect Mother to the Board, to help with housing, to provide transportation vouchers, and to find the assessor when the Court ordered the assessment.

(Judgment Entry, Nov. 30, 2020). We find the record in this case supports the trial court's conclusion that the DCDJFS made reasonable efforts to reunite J.C. and Mother.

{¶58} Mother points to the case plan for H.L., which incorporated Dr. Adkins' suggestions, to argue the efforts towards reunification are different between the siblings and therefore unreasonable for J.C. "The equal protection requirement prevents the government from 'treating differently persons who are in all respects alike.'" *Taylor-Jones v. Kettering Medical Center*, 2021-Ohio-738, -- N.E.3d – , ¶ 21 (2nd Dist.) quoting *Burnett v. Motorists Mut. Ins. Co.*, 118 Ohio St.3d 493, 2008-Ohio-2751, 890 N.E.2d 307, ¶ 30. While J.C. and H.L. are siblings, they are not in all respects alike. J.C. was born on October 14, 2018 and H.L. was born on April 28, 2020. When J.C. was born, Mother had

no permanent residence, she did not have a case plan, she was not working with DCBDD, and she did not have a Guardian. J.C. was placed in the temporary custody of DCDJFS on January 9, 2019. When H.L. was born, one year and three months after J.C. was placed in the temporary custody of DCDJFS, Mother had a case plan, she had been working with the DCBDD, she was working on obtaining stable housing, and she had a Guardian for support.

{¶59} Dr. Adkins' assessment was filed on September 9, 2020. The assessment stated that under a best-case scenario, Mother could possibly be ready to care for a child after one to two years of intensive intervention. At the time of the assessment, J.C. had been in the temporary custody of the DCDJFS for one year and eight months. H.L. had been in the temporary custody of DCDJFS for 134 days. DCDJFS did not treat the siblings differently. Time was the deciding factor in this case in all regards.

{¶60} We find the record supports the trial court's conclusion that DCDJFS made reasonable efforts to reunify Mother and J.C. Mother's second and third Assignments of Error are overruled.

## IV. Best Interests

{¶61} Mother contends in her fourth Assignment of Error that record does not support the trial court's finding it was in the best interests of J.C. to be placed in the permanent custody of DCDJFS. We disagree.

{¶62} R.C. 2151.414(D) governs "best interests" and states the following:

(D) In determining the best interest of a child at a hearing held pursuant to

division (A) of this section or for the purposes of division (A)(4) or (5) of

section 2151.353 or division (C) of section 2151.415 of the Revised Code,

the court shall consider all relevant factors, including, but not limited to, the following:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶63} There is no question in this case that Mother loves her child. Mother has attended all visitation with J.C. J.C. appears happy when she is with Mother during visitation and the witness described them as bonded.

{¶64} J.C. is too young to express her wishes, but the witnesses testified that she was bonded with her foster family and adjusted to her foster home. The foster parents are meeting her medical and therapeutic needs. She has resided with her foster family

since April 5, 2019. She calls her foster parents "mommy" and "daddy." The foster family was interested in adopting J.C.

{¶65} The parties do not dispute that Mother could not immediately and independently care for J.C. due to her developmental disability. Mother *may* be able to independently care for J.C. after one to two years of intensive intervention. The GAL recommended that temporary custody be extended for six months or legal custody granted to the foster parents. The foster parents did not want legal custody of J.C.; they asked the trial court to determine whether the DCDJFS should be entitled to permanent custody. The trial court is not required to follow a GAL's recommendation; it has discretion to follow or reject it. *In re A.M.*, 5th Dist. Licking No. 18-CA-83, 2019-Ohio-1578, 2019 WL 1894488, ¶ 48 citing *Pasco v. Pasco*, 5th Dist. Delaware No. 2018 CAF 06 0047, 2019-Ohio-1099, citing *Clyburn v. Gregg,* 4th Dist. Ross No. 11CA3211, 2011–Ohio–5239, ¶ 47; *Hammons v. Hammons*, 5th Dist. Delaware No. 13 CAF 07 0053, 2014–Ohio–221, ¶ 12. In this case, the trial court stated it chose to follow the recommendation of the CASA.

{¶66} The Court agrees this is a challenging case based on Mother's developmental disability. Mother loves her child and wants to be her parent. The best interest determination, however, focuses on the child, not the parent. *In re C.T.*, 5th Dist. Licking No. 2020 CA 00014, 2020-Ohio-4965, 2020 WL 6147171, ¶ 57 citing *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 59. The trial court's judgment entry reflects the complexity of this case and the record supports the trial court's decision that it was in the best interest of J.C. to grant permanent custody to the DCDJFS.

{¶67} Mother's fourth Assignment of Error is overruled.

## CONCLUSION

{¶68} The judgment of the Delaware County Court of Common Pleas, Juvenile Division, is affirmed.

By: Delaney, J.,

Wise, John, P.J. and

Wise, Earle, J., concur.